# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| BONNIDE JOHNSON, <br> AIS # 137457, | ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | |
| v. | ) | Civil Action No. 12-00233-KD-N |
| | ) | |
| LT. SHARON FOLKS, et al., | ) <br> ) | |
| Defendants | ) | |

## **REPORT AND RECOMMENDATION**

Before the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), for entry of a report and recommendation is the answer (Doc. 17) and special report (Doc. 18) filed by the defendants—Alabama Department of Corrections ("ADOC") Commissioner Kim T. Thomas; now-retired Warden III Tony Patterson; Correctional Lieutenant Sharon Folks; and Correctional Sergeant Valerie Beasley—which has been converted to a motion for summary judgment (*see* Doc. 19). The plaintiff, Bonnide Johnson, has filed his response in opposition (Doc. 29). And for the reasons set forth herein, it is **RECOMMENDED** that summary judgment be **GRANTED** to the defendants and Johnson's case be **DISMISSED**.

## I. Factual Background

While Johnson is currently incarcerated at St. Clair Correctional Facility—serving two consecutive life sentences for robbery and attempted murder (*see* Doc. 18-1 at 1)—he was incarcerated at Holman at the time the relatively

straightforward facts underlying his retaliation lawsuit arose.

Pursuant to ADOC Administrative Regulation 208 (Employee Standards of Conduct and Discipline), Johnson filed a complaint, dated February 23, 2012, against Lieutenant Folks—addressed to Commissioner Thomas and Warden Patterson—stemming from an incident he alleges occurred on February 22, 2012. In Johnson's own words:

> On Wednesday, February 22, 2012, [Lieutenant Folks] handled me in a very abusive, and humiliating way. It may not seem much at first, for no real incident developed; that is to say I reacted in a calm manner though I imediately [sic] became angry.
>
> What happened was that the officials were running everyone back to their respective dorms in order to hold a major shake-down. I was in the law library, and was required to come out. So I came out toting a load of legal papers to work on in the dorm. I am in E-Dorm (The Faith Based Dorm located outside the main building). All the action was going on down the hall in the population dormitories. I had just cleared S-4 gate (there were a number of inmates trying to [get] into S-4 gate), Lt. Folks came up behind me, I didn't see her, but I heard the female voice behind me---dripping with contempt, "get out of my way" I turned to the side, and stepped around me saying in the same scornful tone of voice, "you walking too slow."
>
> Like I said, it wasn't much on the surface, but this is the customary tone she deals with me and other inmates, and I have said enough.
>
> If we'd been on the street, I am almost sure to have reacted differently. And even in prison, there are probably other inmates who would have "went off" as the saying goes, then and there. Thats [sic] the kind of security problem, her mode of handling inmates is likely to trigger in time.
>
> That brings to mind an recent [sic] honor dorm lesson that is relevant here. A film was shown in "Community Healing" class where various social scientist, were showing, and expounding on what makes people suddenly kill, assault, "road rage," etc. is because they feel they have been <u>humiliated</u>.
>
> Now if this is a known scientific fact---yet a major aspect of

2

> imprisonment is the daily humiliation of inmates: which they must stiffle [sic] these responses---for years. But once they're turned loose to the free world---woe to any citizen that dares so much as have a hint of disrespect in his voice.
>
> That is to say, that kind of treatment, not only by her, but the correctional officers generally is not only a threat to security, but is detrimental to society as well. Our communities here and on the street need some serious healing.
>
> But again, I am not seeking any severe penalty for Lt. Folks, far from it. Like I tried to explain to her months ago, I love and respect women; especially black women. My mother was a college educated/black woman, and I was raised by her, my aunt and my older sister: I relate very much to the immense problems they have trying to make their way in a man's world. I just think the problem should be brought to her attention.

(Doc. 18-2 at 3-4, 12-13 (emphasis in original).)

Lieutenant Folks submitted an incident report related to Johnson's letter on February 28, 2013. (See Doc. 18-2 at 2.) According to that report, that day, she "was sorting through the morning mail [and] observed [Johnson's letter to Warden Patterson]." (*Id.*) In her incident report, Lieutenant Folks first recounts some statements from Johnson's letter and then characterizes Johnson's letter as threatening: "These comments were made towards [me] as a threat towards [my] life. [I] feel[] that [I] can not function at this facility with a fear for [my] life being threaten [sic] by inmate Johnson." (*Id.*) The incident report continues:

> As the Lieutenant, managing the Inmate Control System, Lt. Folks comes in contact with a lot of inmates. Mainly, when it comes to the institutional law library. Inmate Johnson was an assigned clerk for the inmate law library, but inmate Johnson was removed by Lt. Folks because of inmate Johnson's conduct while working in the law Library. Lt. Folks feels that this threatening letter is a result of inmate Johnson being removed from the law library. Lt. Folks requests that classification review inmate Johnson's file for possible transfer to another facility.

3

(*Id.*)

The report concludes by documenting that Johnson was examined by the prison's health care unit and released back into a segregation holding cell. (*See id.*) "Inmate Johnson will be receiving disciplinary action for rule violation #44—Threats. No further action taken." (*Id.*)

Indeed, the record produced by the defendants, which has not been controverted by Johnson, establishes the following:

- Johnson was served with a disciplinary report based on the aforementioned incident report on February 29, 2012. (*See* Doc. 18-2 at 5.)

- Sergeant Beasley was appointed as the hearing officer pursuant to ADOC Administrative Regulation 403 (Doc. 18-5). (*See* Doc. 18-4, Beasley Aff.)

- Johnson provided a written statement, dated March 1, 2012, in response to Lieutenant Folks's complaint (Doc. 18-2 at 8-13).

- A hearing was held on March 2, 2012 (*see generally* Doc. 18-2 at 5-7), at which Johnson was able to question Lieutenant Folks and call as a witness, Warden Patterson. (*See id.* at 5; *see also* Doc. 18-6, Patterson Aff.) The hearing officer, however, deemed Johnson's only question to Patterson irrelevant. (*See* Doc. 18-2 at 6.)

- It was ultimately determined that Johnson violated Rule 44. And the hearing officer recommended that he receive thirty days disciplinary segregation and be referred to classification. The warden's designee approved her recommendation on March 5, 2012. (*See* Doc. 18-2 at 7.)

## II. <u>Legal Framework</u>

Johnson's § 1983 complaint (Doc. 1), dated April 2, 2012, asserts a single cause of action against the defendants—in their individual and official capacities—for retaliating against him for exercising his First Amendment right to petition the government for redress of grievances. He seeks compensatory and punitive

4

damages; that the disciplinary be expunged from his record; and that the defendants "and their co-workers" be enjoined from retaliating against him further.[1]

## A. Official capacity claims.

First, any official capacity claims against the defendants—all state employees during the applicable time period—can be quickly dispatched. As the Middle District of Alabama recounted in another § 1983 case, also presenting a retaliation cause of action,

> Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997); *Powell v. Barrett*, 496 F.3d 1288, 1304, 1308 (11th Cir. 2007) (state defendants sued in their official capacity for monetary damages are immune from suit under the Eleventh Amendment).

*Johnson v. Keaton*, No. 2:05-CV-1238-WKW, 2008 WL 4493242, at *6 (M.D. Ala. Sept. 29, 2008) (some internal citations modified and footnote omitted).

Therefore, "it is clear that the defendants are [or, at the time, were[2]] state

---

[1] Because it is clear that Johnson cannot state a *prima facie* case for retaliation, it follows that he is not entitled to injunctive relief pursuant to § 1983. *Cf. O'Shea v. Littleton*, 414 U.S. 488, 494 n.2 (1974) (noting that, while statutes such as § 1983 "creat[e] legal rights, the invasion of which create[] standing, even though no injury would exist without the statute[,] . . . such statutes do not purport to bestow the right to sue in the absence of any indication that invasion of the statutory right has occurred or is likely to occur" (citations omitted)).

[2] Warden Patterson retired from ADOC on March 1, 2013. (*See* Doc. 18-6.)

5

officials entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. Thus, the defendants are entitled to absolute immunity from any claims for monetary relief presented against them in their official capacities." *Id.* (citations omitted).

B.  **Review of a prisoner's retaliation claim.**

"The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) (per curiam) (quoting *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003)). And "[a]n inmate may maintain a cause of action for retaliation under 42 U.S.C. § 1983 by showing that a prison official's actions were 'the result of [the inmate's] having filed a grievance concerning the conditions of his imprisonment.'" *Id.* (quoting *Farrow*, 320 F.3d at 1248); *accord Boxer X v. Harris*, 437 F.3d 1107, 1112 (11th Cir. 2006); *see also Sharp v. Franklin*, No. 06 C 2579, 2010 WL 747682, at *4 (N.D. Ill. Feb. 26, 2010) ("With respect to prisoners, [ ] the First Amendment right includes the right to petition the Government for redress of grievances.").

[But, t]o prevail[3] on a constitutional claim of retaliation against

---

But it is undisputed that he was a state official "at all times relative to [Johnson's] complaint"; as such, "[d]ismissal with prejudice is proper to the extent [he is] sued in [his] official capacity." *E.g., Thomas v. Secretary, Dep't of Corrs.*, No. 8:08-cv-931-T-17MSS, 2008 WL 2949519, at *2 (M.D. Fla. July 28, 2008) ("It is undisputed that all served Defendants were state employees in their capacities as Circuit Court Judge, prosecutors/state attorneys or a probation officer at all times relative to this complaint. Thomas cannot demonstrate any state waiver of its Eleventh Amendment immunity. Dismissal with prejudice is proper to the extent Defendants are sued in their official capacity.").

<sup>3</sup> "Alleging a retaliation claim is relatively easy; however, proving such a claim is hard and, at the summary judgment stage, a plaintiff must do more than merely allege retaliation." *Sharp*, 2010 WL 747682, at *5.

6

prison officials, an 'inmate must establish . . . three elements: (1) his speech [or action] was constitutionally protected; (2) the inmate suffered adverse action such that the [defendants'] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech [or action]; and (3) there is a causal relationship between the retaliatory action and the protected speech [or act].

*Johnson*, 2008 WL 4493242, at *6 (quoting *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008) (in turn citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005))); *accord O'Bryant*, 637 F.3d at 1212.[4]

### III. Analysis

Here, the defendants appear to concede an aspect of the first element: "that [Johnson's] prior law suit or general inmate grievance about his conditions—here

---

[4] Importantly, however, as stated in *Johnson*, "an inmate's rights established under the First Amendment are not protected if allowing such protection is 'inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" 2008 WL 4493242, at *7 (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). This is so because

> Federal law recognizes "that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' As [this Court has previously] acknowledged, 'the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.' Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources. . . ." *Turner v. Safley*, 482 U.S. 78, 84-85 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974)). Correctional officials are therefore "accorded latitude in the administration of prison affairs[,]" *Cruz v. Beto*, 405 U.S. 319, 321 (1972), which necessarily includes "the withdrawal or limitation of many [inmate] privileges and rights." *Pell*, 417 U.S. at 822; *Shaw v. Murphy*, 532 U.S. 223, 229 (2001) ("In the First Amendment context, . . . some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'" (quoting *Pell*, 417 U.S. at 822)).

*Id.* (formatting and internal citations modified or omitted); *accord Smith*, 532 F.3d at 1277 (the lesson of *Turner*, *Cruz*, and *Pell*, collectively, is "that an inmate's First Amendment right to free speech is not protected if affording protection would be inconsistent with the inmate's status as a prisoner or with the legitimate penological objectives of the corrections system" (citations and internal quotation marks omitted)).

7

the actions/inactions of Folks in a prior, unrelated incident—constitutes constitutionally protected activity" (Doc. 18 at 5). Thus, the defendants do not appear to argue that Johnson's filing of a grievance against Lieutenant Folks itself is not an act protected by the First Amendment. They, moreover, expressly concede the second element: "that time spen[t] in segregation as a result of a prison disciplinary would likely deter a person of ordinary firmness from engaging in protected speech." (*Id.*)

They contend, however, "that the threatening statements made in [Johnson's] letter . . . are not constitutionally protected" (*id.*), and therefore, he cannot state a *prima facie* case for retaliation. Said somewhat differently, Johnson cannot establish a *prima facie* case for retaliation because he was disciplined for the threatening content of his grievance against Lieutenant Folks—***not for*** the constitutionally protected act of filing a grievance. Thus, he cannot prove the third element: that there is a causal relationship between the retaliatory action and the ***protected*** speech or ***act***.

The undersigned agrees. As explained below, Johnson cannot state a *prima facie* case for retaliation for two separate, but related reasons.[5]

---

[5] Having determined that that has been no constitutional violation, it is not necessary to consider the defendants' qualified immunity defense (*see* Doc. 18 at 18-22). *Compare Helm v. Hughes*, No. C09–5381 RJB/KLS, 2011 WL 476461, at *10 (W.D. Wash. Jan. 6, 2011) ("It is not necessary to address Defendants' arguments that qualified immunity should be applied to Mr. Helm's claims because the undersigned has concluded that Defendants did not violate Mr. Helm's constitutional rights."), *report and recommendation adopted*, 2011 WL 462567 (W.D. Wash. Feb. 4, 2011), *with Entler v. Gregoire*, No. CV–12–5141–JPH, 2013 WL 6729527, at *4 (E.D. Wash. Dec. 19, 2013) (affirming the correctness of this approach, but noting that the magistrate judge in that case found that the defendants were entitled to qualified immunity).

**A. The "speech" contained in Johnson's grievance, which is what gave rise to his disciplinary, is not constitutionally protected. The applicable rule, punishing speech determined to be threatening—the rule Johnson was disciplined pursuant to—is, moreover, reasonably related to penological interests. As such, there has been no actionable constitutional violation.**

Johnson casts this as "a simple case of retaliation [by] a[] prison official . . . against an inmate . . . for [filing] an official complaint against her." (Doc. 29 at 5; *see also id.* ("The law of the matter is clearly on the side of plaintiff; for the right to petition one's government for a redress of grievance is protected speech. Thats [sic] the bottom line. It is simple as that. And no rational minded person would see anything in the 208 complaint filed against defendant Folks is illicit, unlawful, or otherwise express an intention to do her harm." (citation and internal quotation marks omitted)).) In this respect, Johnson's claim for retaliation is very similar to a retaliation claim filed by a Washington state inmate, Helm. In *Helm v. Hughes*, No. C09–5381 RJB/KLS, 2011 WL 476461 (W.D. Wash. Jan. 6, 2011), *report and recommendation adopted*, 2011 WL 462567 (W.D. Wash. Feb. 4, 2011), Helm too argued "that he submitted a grievance, he has a constitutional right to submit a grievance, [and that] he was infracted and disciplined in retaliation for filing the grievance." *Id.* at *9.[6]

Also like Johnson, Helm "maintain[ed] that he was wrongly disciplined

---

[6] There, the court ultimately determined that Helm "failed to show that he was engaged in the exercise of a constitutional right when he submitted a grievance containing the language: ' . . . This was abuse, abuse is violence, violence begets violence. If I didn't have such control like some, there would of [sic] been an incident.'" *Id.* at *9; *compare id.*, *with* Doc. 4, 13 (Johnson regarding Lieutenant Folks: "If we'd been on the street, I am almost sure to have reacted differently. And even in prison, there are probably other inmates who would have 'went off' as the saying goes, then and there. Thats [sic] the kind of security problem, her mode of handling inmates is likely to trigger in time.").

9

because the language contained in his grievance was not a direct threat." *Id.* at *4; *compare id.*, *with* Doc. 29 at 5-9 (explaining how his grievance against Lieutenant Folks was misconstrued by ADOC officials to be threatening). But, as the district court in Washington pointed out, "*Shaw*[ *v. Murphy*, 532 U.S. 223, 229 (2001),] instructs, [ ] that the court's focus must be content neutral[,]" *Helm*, 2011 WL 476461, at *4, which means

> [p]rison officials are to remain the primary arbiters of the problems that arise in prison management. If courts were permitted to enhance constitutional protection based on their assessments of the content of the particular communications, courts would be in a position to assume a greater role in decisions affecting prison administration. Thus, this court will not second guess prison officials' determination that the language contained within [Johnson's] grievance contained a threat. The issues here are whether the prison regulation at issue is "reasonably related" to legitimate penological objectives and whether there is a genuine dispute that prison officials acted unreasonably in applying the prison regulation to [Johnson's] written grievance.

*Id.* (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987); *Procunier v. Martinez*, 416 U.S. 396, 404 (1974)).

Further, to the extent Johnson argues, like Helm did,

> that prison officials misinterpreted and manipulated his words[,] . . . there is no dispute here as to what [was] wr[itten]. [Moreover,] it is also not up to this court to inquire whether what he wrote was in fact within the ambit of the governing [A]DOC policy and whether the prison officials applied their own policy. . . . [Instead,] the proper question[—the sole question for this Court to consider—]is whether in the particular circumstances of [Johnson's] case, prison officials had legitimate reasons to apply the governing regulation, independent of whether the regulation was ultimately deemed violated. *See, e.g., Shaw*, 532 U.S. at 232 ("[T]he question remains whether the prison regulations, ***as applied*** to Murphy, are 'reasonably related to legitimate penological interests.'") (emphasis added). To prevail, [Johnson] must overcome the presumption that the prison officials acted within their "broad discretion." *Shaw*, 532 U.S. at 232 (citing *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)).

*Id.* at *5 (internal citations modified).[7]

As mentioned above, to determine whether "the governing regulation" at issue—ADOC Rule 44, pertaining to threats—is reasonably related to legitimate penological objectives, the undersigned must consider the test set out in *Turner v. Safley*. *See, e.g., Lolley v. Louisiana Corr. Servs.*, Civil Action No. 09–00555–CG–B, 2011 WL 4499331, at *6 (S.D. Ala. Sept. 9, 2011) ("A prison regulation, even though it infringes the inmate's constitutional rights to some degree, is an actionable constitutional violation only if the regulation is unreasonable using the four factors

---

[7] The court in *Helm*'s "as-applied" analysis is equally applicable to the case before the undersigned:

> Mr. Helm argues that he did not intend his words to be viewed as a threat. However, it is not up to this court (or a jury) to guess what Mr. Helm might have been thinking when he wrote his grievance. Even if the court accepted that Mr. Helm did not intend a threat, it is not this court's role to suggest to prison officials that an alternative interpretation may exist. In *Bell v. Wolfish*, the Supreme Court emphasized that "courts should defer to the informed discretion of prison administrators because the realities of running a corrections institution are complex and difficult, courts are ill-equipped to deal with these problems, and the management of these facilities is confided to the Executive and Legislative Branches, not to the Judicial Branch." 441 U.S. 520, 547 n.29 (1979) (citations omitted).
>
> . . . [T]here is no issue of material fact here as to what Mr. Helm said. He wrote what he wrote. Whether he intended to threaten Correctional Officer Benge is not material to this analysis. What is material is that there exists a regulation to prohibit threatening language, the regulation is constitutional because it has legitimate penological purposes, and prison officials reasonably determined that the regulation should be applied to the words contained in Mr. Helm's grievance. Grievance Specialist Hughes believed that the language constituted a threat. He sent the grievance on to Superintendent Van Boening, who agreed that the words represented a threat. Mr. Hughes then instituted the infraction process and the infraction was upheld in a disciplinary hearing by Hearings Officer Janet Gaines and Superintendent Designee Sean Murphy. The court concludes that they did not act unreasonably in applying the regulation to Mr. Helm's written grievance.

*Id.* at *8 (internal citation modified).

11

set forth in the Supreme Court's *Turner v. Safley*, 482 U.S. 78 (1987) decision[.]" (citation modified)), *report and recommendation adopted*, 2011 WL 4499320 (S.D. Ala. Sept. 29, 2011). That test examines the following four factors:

> (1) whether the regulation or practice in question furthers a legitimate governmental interest unrelated to the suppression of expression; (2) whether there are alternative means of exercising First Amendment rights that remain open to prison inmates; (3) whether the right can be exercised only at the cost of less liberty and safety for guards and other prisoners, and the effect on prison resources in general; and (4) whether an alternative exists which would fully accommodate the prisoners' rights at *de minimis* cost to valid penological interests.

*Id.* at *6 n.7.

Consideration of an ADOC rule/regulation prohibiting threats by inmates against, here, a correctional officer (Rule 44) pursuant to the four *Turner* factors yields a clear result—that such a rule/regulation is undoubtedly reasonably related to penological interests. And other courts to consider the same do not disagree. *See, e.g., Helm*, 2011 WL 476461, at *5-8 (regulation concerning threatening another with bodily harm or with any offense against another person, property, or family— "Whether written or spoken, there is clearly a rational connection between the regulation of prohibiting inmates from threatening and coercing persons and the legitimate interest of maintaining order in institutions."); *Entler v. Gregoire*, No. CV–12–5141–JPH, 2013 WL 6729527 (E.D. Wash. Dec. 19, 2013) (applying *Helm* to regulations pertaining to the use of physical force, intimidation, or coercion against any person; and to the use of abusive language, harassment, or other offensive behavior directed to, or in the presence of, staff); *Sobin v. Hise*, No. 01–CV–54, 2002 WL 32349407, at *1-2 (E.D. Va. Sept. 4, 2002) ("[E]ven assuming Sobin had a First

Amendment right to engage in the conduct as alleged, a regulation limiting inmates' attempts to threaten staff in order to gain special privileges passes constitutional muster because such an infringement is reasonably related to penological interests.").

> **B. Furthermore, because Johnson's alleged retaliation—the disciplinary for violating Rule 44—was imparted for an actual violation of that rule, a decision (1) made after he was afforded adequate due process; and (2) that is supported by "some evidence," his claim for retaliation is precluded.**

As the defendants correctly argue, "where a prisoner alleges that the retaliation was in the form of a disciplinary action, his claim is precluded if the discipline was imparted for an actual violation of prison rules." *Parker v. Thomas*, No. 7:12–cv–03503–RDP–RRA, 2013 WL 1180310, at *4 (N.D. Ala. Feb. 6, 2013) (citing *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994); *Earnest v. Courtney*, 64 F.3d 365, 367 (8th Cir. 1995)), *report and recommendation adopted*, 2013 WL 1180309 (N.D. Ala. Mar 18, 2013). More specifically, "as long as a prisoner is found guilty of an actual disciplinary infraction after being afforded due process and there was some evidence to support the disciplinary findings, a prisoner cannot later state a claim of retaliation against the officer who reported the infraction." *Id.* (citation and footnote omitted).

As Magistrate Judge Anderson explained in *Parker*, "[t]o maintain otherwise would invite prisoners to openly flout prison rules on the heels of having filed a grievance or lawsuit, and then assert a § 1983 claim arguing that they were disciplined in retaliation for having exercised constitutional rights." *Id.* (citing *Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir. 1990)).

13

In *O'Bryant*, the Eleventh Circuit "adopted the approach taken by the Eighth Circuit in [*Orebaugh*, *Henderson*, and *Earnest*]." *Parker*, 2013 WL 1180310, at *4 (citing 637 F.3d 1207). And there, the court of appeals stated, "an inmate cannot state a claim of retaliation for a disciplinary charge involving a prison rule infraction when the inmate was found guilty of the actual behavior underlying that charge after being afforded adequate due process," *Parker*, 2013 WL 1180310, at *4 (quoting *O'Bryant*, 637 F.3d at 1215), as long as "there [is] 'some evidence' to support the disciplinary hearing officer's findings of fact[,]" *id*. This additional requirement does not, however, mean it is "appropriate for the court to 'retry' the disciplinary charges or second guess the findings of the prison administration. To do so 'would render the prison disciplinary system impotent by inviting prisoners to petition the courts for a full retrial each time they are found guilty of an actual disciplinary infraction after having filed a grievance.'" *Id.* at *4 n.4 (quoting *O'Bryant*, 637 F.3d at 1216). All the court requires "is some evidence to support the hearing officer's findings[;] the *O'Bryant* decision makes it clear that this court is not to second guess those findings." *Id.* at *5 n.6 (citing *O'Bryant*, 637 F.3d at 1215 ("Whether an inmate actually committed the charged infraction or whether the disciplinary report falsely accuses the inmate are questions of fact that are decided by the disciplinary panel.")).

Further, as to what constitutes "adequate due process," *Wolff v. McDonnell*, 418 U.S. 539 (1974) outlines "[t]he minimal due process requirements." *Parker*, 2013 WL 1180310, at *4 n.5.

> The holding in *Wolff* requires: (1) that the inmate be given written notice of the charges, (2) that the fact-finder issue a written statement outlining the evidence relied upon and the reasons for any disciplinary action and (3) that the inmate be allowed to call witnesses and present documentary evidence, provided it will not be unduly hazardous to institutional safety or correctional goals.

*Id.* (citing 418 U.S. at 564–66).

Johnson's retaliation claim is precluded by *O'Bryant*. Quite simply, as the uncontroverted summary judgment evidence shows, he was adjudged guilty by a disciplinary hearing officer, Sergeant Beasley, of actually threatening Lieutenant Folks, in violation of ADOC Rule 44, after first being served with the written disciplinary report (*see* Doc. 18-2 at 5). Sergeant Beasley's determination was made in a written statement that sets forth the evidence she relied upon and her reasons for the recommended disciplinary action. (*See* Doc. 18-2 at 5-7.) And Johnson was allowed to call a witness and present evidence. (*See* Doc. 18-2 at 5-7, 8-13; *see also* Doc. 18-6.)

## IV. Conclusion

Because Johnson has failed to state a *prima facie* claim for retaliation, for all the reasons discussed above, it is **RECOMMENDED** that the defendants' motion for summary judgment (*see* Docs. 17, 18, 19) be **GRANTED** and that his case be **DISMISSED**.

## V. Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this

15

document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b); S.D. ALA. L.R. 72.4. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 17th day of January, 2014.

                                       */s/ Katherine P. Nelson*
                                       **KATHERINE P. NELSON**
                                       **UNITED STATES MAGISTRATE JUDGE**